**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| CAMICO Mutual Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 2:15-cv-1823-PMD |
| v. | ) | |
| | ) | **FINDINGS OF FACT AND** |
| Jackson CPA Firm f/k/a Jackson and | ) | **CONCLUSIONS OF LAW** |
| Hammond, LLC f/k/a Jackson and Hill | ) | |
| LLC; Brent Hill; Frank Jackson; David | ) | |
| Brooks; Marcia Brooks; Jarrod Brooks; | ) | |
| Zita, Inc.; AAA Fence Company of | ) | |
| Charleston, Inc.; and Mike Dohoney's | ) | |
| Barrier Island Construction Specialists, | ) | |
| Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court following a bench trial. For the reasons stated herein, the

Court enters judgment for Plaintiff CAMICO Mutual Insurance Company.

## BACKGROUND

This is a professional liability insurance coverage dispute between an insurance carrier,

the accountants and accounting firm it insured, and several of the firm's clients. The dispute

relates to three state-court malpractice lawsuits the clients have filed against the accountants over

the alleged mishandling of their taxes. In this case, CAMICO seeks a judicial declaration of the

extent of its obligation to defend and indemnify Defendants Jackson CPA Firm, Brent Hill, and

Frank Jackson (the "Accountants") in those malpractice cases. The Accountants contend

CAMICO has breached one or more of the insurance policies it sold them and that it has acted in

bad faith. Defendants David Brooks, Marcia Brooks, Jarrod Brooks, Zita, Inc., AAA Fence

Company of Charleston, Inc., and Mike Dohoney's Barrier Island Construction Specialists, Inc.

(the "Clients") also seek a declaratory judgment regarding CAMICO's obligations in their lawsuits.

CAMICO filed this action in April 2015. After the parties conducted discovery and filed cross-motions for summary judgment, the Court found there were genuine issues of material fact and therefore denied the motions. The parties tried the case on August 16 and 17, 2016. Having considered the evidence admitted at trial, as well as the parties' pre-trial briefs and post-trial submissions, the Court now makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

Based on the preponderance of the evidence in the record, the Court finds as follows:[1]

### I.    The Accountants and Their Insurance Policies

1.    For years, certified public accountants Frank Jackson and Brent Hill worked together in their two-member accounting firm, Jackson and Hill, LLC. Their association ended with Hill's retirement in August 2011. Following some additional personnel changes, Jackson now practices alone in Jackson CPA Firm, LLC.

2.    Since 2005, CAMICO has insured the Accountants under a series of professional liability, claims-made-and-reported policies. The policies have a retroactive date of July 1, 1998.

3.    Each policy provides a year of coverage that begins on January 28 of the year. For example, the main policy at issue here has an effective date that runs from January 28, 2011, to January 28, 2012 (the "2011–2012 policy").

---

1.    The Court recognizes that certain of its factual findings could be perceived as commenting on the merits of the Clients' state-court malpractice claims. The Court stresses that it expresses no opinion as to liability or damages in those cases.

4.      Each policy's declarations page lists a general indemnity limit of $1,000,000 per claim and $2,000,000 aggregate.  An endorsement to each policy provides a separate limit of $250,000 for defense costs and other claim expenses.

5.      Each policy contains an identical insuring agreement.  However, each policy also has an endorsement titled "Limited Coverage for 'Known Claims' Endorsement" that changes parts of the insuring agreement.  For example, the known-claims endorsement for the 2011–2012 policy deletes section A of that policy's insuring agreement and replaces it with an insuring agreement that provides, in relevant part, as follows:

**A.      Coverage for *Damages* and Reporting Requirements**

1.      The Company will pay those sums that an *Insured* becomes legally obligated to pay as *Damages* because of a *Claim* arising out of an *Insured's* negligent act, error or omission in rendering or failing to render *Professional Services* performed after the *Retroactive Date* and before the end of the *Policy Period*, provided that:

(a)      The *Claim* was first made against the *Insured* and reported to the Company during the same *Policy Period*; and

(b)      The *Claim* was not reported to any professional liability insurer, including the Company, prior to the effective date of the *Policy Period* identified in the policy's Declarations.

. . . .

4.      If any *Insured* became aware of a *Claim* or a *Potential Claim* either after the *Retroactive Date* of this Policy or during the twelve (12) months prior to the Effective Date of this *Policy Period*, whichever is later, and reports that *Claim* or *Potential Claim* to the Company during the *Policy Period*, that *Claim* or *Potential Claim* shall be deemed timely reported to the Company during the *Policy Period*; however, the Limits of Liability applicable to such *Claim* or *Potential Claim* shall be limited to the amount stated in section I. INSURING AGREEMENTS, C. Limits of Liability, Sub-Limits and Deductibles, paragraph 1.c.

6.    The policies define "Claim" as follows:

a demand received by any *Insured* for money or services, and includes the service of suit(s), a request that an *Insured* agree to waive a legal right or sign an agreement to toll a statute of limitations, or a demand for arbitration. A *Claim* also includes two or more *Claims* arising out of or resulting from a single act, error or omission in rendering *Professional Services*, or from *Multiple Acts*, *Errors or Omissions* in rendering *Professional Services*, whether such demands are made: (1) against one or more *Insureds*; (2) by one or more *Persons*, or (3) during one or more *Policy Periods*.

7.    The policies define "Multiple Acts, Errors or Omissions" as "all acts, errors or omissions in rendering *Professional Services* that are logically or causally connected by any common fact(s), circumstances, situation, transaction(s), event(s), advice or decision(s)." The policies go on to state that a single per-claim coverage limit "applies to a *Claim* arising from *Multiple Acts*, *Errors or Omissions*, regardless of the number of claimants, lawsuits, or *Insureds* involved."

8.    The policies define "Potential Claim" as "an event or circumstances that any *Insured* might reasonably expect would be the basis for a *Claim*." In turn, *Insured* includes Hill, Jackson, their firm, and its employees.

9.    As mentioned above, paragraph A.4 of the known-claims endorsement's insuring agreement limits the coverage for certain claims to "the amount stated in section I. INSURING AGREEMENTS, C. Limits of Liability, Sub-Limits and Deductibles, paragraph 1.c." That subparagraph, which the endorsement adds, provides as follows:

The maximum amount payable by the Company for *Damages* and *Claim Expenses* for each covered *Claim* reported during this *Policy Period* pursuant to section I. INSURING AGREEMENTS, A. Coverage for *Damages* and Reporting Requirements, paragraph 4., shall be either $100,000 or 25% of the Per *Claim* Limit of Liability stated on the Declarations, whichever is less. Amounts paid on behalf of an *Insured* pursuant to this paragraph are chargeable against the applicable Deductible and the Limits of Liability.

10.    Finally, the known-claims endorsement eliminates separate defense limits for claims that are afforded coverage under the known-claims endorsement.

## II.    Hill's Declining Health and Work Performance

11.    Hill was diagnosed with Parkinson's disease in 2006.  After being diagnosed, he continued to practice accounting for several years.

12.    Over those years, the symptoms of Parkinson's disease gradually worsened, affecting Hill's work.  The disease caused Hill to experience tremors, fatigue, and a loss of concentration, such that he became disorganized and frequently could not complete much work in a typical work day.

13.    As those physical and mental impediments worsened, they were also exacerbated by certain stressors, including the demands of caring for his mother as her own health declined and financial difficulties that arose due to his inability to produce billable time.  As a result, Hill's ability to work suffered even more.  Among other things, he could no longer complete his work in time to either meet his clients' filing deadlines or seek extensions.  Hill's failures to file resulted in clients being assessed interest and late penalties.

14.    By 2010, Hill's conditions reached, as he put it, "critical mass."  Due to the symptoms of his Parkinson's disease and those external stressors, on many days he could barely accomplish three hours of work over the course of a twelve-hour workday.  However, he did not notify clients of his growing inability to work or the consequent tax problems they were facing.

15.    At Jackson's suggestion, the firm began delegating some of Hill's work.  Staff accountant Rita Hammond recommended the firm contract with accountant Marty Hicks to help Hill.  Hicks' primary responsibility was to negotiate with state and federal tax agencies in an effort to reduce or abate interest and penalties they had assessed against Hill's clients for Hill's

late filings.  The firm also hired an assistant to help Hill with organization and to communicate

with clients.

16.    In February and March 2011, Hill sent the IRS a series of letters relating to late

penalties it had assessed against several of his clients due to their returns not being timely filed.

Each letter included the following:

> I would like to take responsibility for the failure to file on time and for any lack of
> a prompt response to notices regarding the matter.   Due to personal
> circumstances, I was unable to complete returns for all of my clients by the
> extended deadlines, and am just now finding myself able to pay proper attention
> to wrapping up my commitments to some of my clients related to 2009.
>
> On-going adjustments to living with Parkinson's disease and problems with the
> side effects of medications reduced my productivity greatly for most of last year.
> Also, I have been the only family member available to see to the care of my 83-
> year old mother, and that role intensified through 2010 as her mental and physical
> conditions deteriorated.  The last four months of the year have proved to be the
> most stressful of my life, as most of my time and energy was spent seeing her
> through seven hospital visits, a move from her home to an assisted living facility,
> then to a nursing home, where she spent her final six weeks under hospice care.
> She passed away January 2nd.   With that behind me, and with a recent change in
> medication making the Parkinson's more tolerable, I am now getting my health
> and life back in balance and better able to do the job of helping my clients meet
> their tax-filing responsibilities in a timely manner.

He concluded at least one of the letters by declaring, under penalty of perjury, that the block-

quoted language above was true.

17.    Hill concluded several of the letters by asking the IRS to abate his clients' late

penalties "due to circumstances beyond taxpayer control"; in at least one other letter, he sought

abatement "due to circumstances beyond taxpayer control (and preparer) control."[2]

_____

2.    It is not clear how many of these letters Hill sent the IRS.  The Clients have asserted in this case that there is no
evidence that Hill sent such letters in relation to any of them.  In state court, however, Zita and the Brooks family
have alleged they believe Hill did send the IRS such a letter on their behalf.  Based on those allegations and the
circumstantial evidence in the record, the Court finds that Hill did send the IRS such letters on behalf of each of the
Clients that contained the block-quoted language above.

18.    Hill retired in August 2011.  He announced his retirement to his clients through a mass letter he sent on August 22, in which he stated, "Most Parkinson's patients reach a point when they can no longer function effectively in a job that involves a high volume of deadline-intensive work.  I am past that point."

19.    When Hill retired in August 2011, Hicks and staff accountant Rita Hammond took over Hill's files.  Hammond joined with Jackson to form the firm Jackson and Hammond, LLC, which continued contracting with Hicks.  Hammond and Hicks thereafter continued to work with tax agencies on behalf of Hill's former clients in an attempt to mitigate the consequences of missed filing deadlines.  Hammond and Hicks left the accounting firm in September 2012, taking with them all the files for Hill's former clients.  They formed their own firm and performed work for a number of Hill's former clients.

20.    Hill's health has continued to decline since he retired.  By the time of trial, Hill's memory of his work for the Clients was significantly diminished due to his disease.  Thus, through no fault of his own, his testimony carried little weight.

### III.    The RMTP Claim

21.    Hill's former clients included two related companies, Royal Marine Packing, Inc. and Transport Partners, Inc. (collectively, "RMTP").  In 2010, Hill's services to RMTP included preparing and filing special five-year loss carryback elections.  Hill worked on those election packages during the fall of 2010, which was when his personal struggles reached "critical mass."

22.    Hill prepared the election packages and submitted them to the IRS in November 2010.  Later that month, however, the IRS rejected the elections because Hill's submissions did not include an IRS Form 1120, the annual corporate income tax return form, for either client.

23.     Upon receipt of the IRS's rejection notice, Hill and others at the firm searched the office and found RMTP's 1120 forms, each completed and signed by an RMTP representative. It turned out that Hill had not mailed them when he submitted the election packages.  Hill and Hicks then sent the forms to the IRS.  By that point, however, the submission was untimely.  In December, the IRS again rejected the five-year carryback elections because it had not timely received the 1120 forms.

24.     At that time, Jackson knew Hill was having problems due to his declining health, that Hill had made an error on RMTP's taxes, and that Hicks was communicating with tax agencies in an effort to abate interest and late-filing penalties that Hill's clients had incurred.

25.     Over the next four months, Hicks communicated with the IRS in an attempt to get it to reverse its decision and allow RMTP's carryback elections.  As Jackson would later tell CAMICO, Hicks was asking the IRS change its position "due to [Hill's] Parkinson's, etc."

26.     In March 2011, an IRS representative told Hicks that the IRS would allow the five-year carryback elections.  However, the IRS ultimately rejected the elections for a final time that June.  In September 2011, RMTP filed standard two-year carryback elections, which the IRS accepted.  According to Jackson, Hill's failure to obtain the five-year carryback elections cost RMTP $20,600.

27.     In September 2011, RMTP's manager contacted Jackson to make a claim for the losses sustained due to the failed carryback elections (the "RMTP claim").  Jackson then reported the claim to CAMICO.  Prior to that report, no one had informed CAMICO about Hill's errors or the subsequent efforts to persuade the IRS to allow the elections.

28.     Because Hill and others in the firm were aware of Hill's error and the IRS's initial rejection in late 2010 but did not report the problem to CAMICO until September 2011,

8

CAMICO processed the RMTP claim under Paragraph A.4 of the 2011–2012 policy's insuring agreement and the known-claims endorsement's reduced coverage limit of $1,000,000. In November 2011, CAMICO settled the RMTP Claim for $20,600, leaving $79,400 left on the limit for that claim.

## IV.    The Clients' Claims

29.    The Client defendants in this case are all former clients of Hill. In their state-court lawsuits, the Clients all allege Hill committed professional negligence in his handling of their various tax matters.

### A.    Zita, Inc. and the Brooks Family

30.    Zita, Inc. is a consulting company that Jarrod Brooks, David Brooks, and Marcia Brooks own. David and Marcia are Jarrod's parents. From 2004 to 2011, the Brooks family retained Hill to prepare their and Zita's income tax returns.

31.    Hill did not complete their returns for the years 2003, 2004, 2005, and 2006 until the end of 2007. By that point, those returns were all overdue with both the IRS and the South Carolina Department of Revenue ("SCDOR"), resulting in the assessment of interest and late penalties.

32.    When Hill completed that set of returns, he advised David and Marcia Brooks not to file their returns for 2003 to 2005 until they had sufficient funds available to pay their tax liabilities for those years. They followed that advice, which resulted in further penalties being assessed.

33.    Although retained to do so, Hill never prepared Zita's or any of the Brooks family members' tax returns for the tax years 2008, 2009, and 2010. Rather, Hammond prepared and filed them in 2012. By that point, however, the returns were well past due.

34.     The IRS and the SCDOR assessed interest and late penalties against Zita and the Brooks family members for the late filing of their returns for the years spanning 2003 to 2010.

35.     In December 2010, Jarrod Brooks discussed the assessments and the late filings with Hill, who referred Brooks to a tax attorney.  Brooks consulted that attorney in late 2010 or early 2011, but then instead used Hicks to attempt to abate the interest and penalties assessed against him, his parents, and their company.

36.     With Hicks' assistance, the Brooks family and Zita resolved their tax issues regarding years 2003 to 2006 in the summer of 2011 by paying significant amounts to the IRS. After Hill retired, they continued working with Hicks.  They resolved their tax issues for the years 2008 to 2010 in 2014.

**B.     Mike Dohoney's Barrier Island Construction Specialists, Inc.**

37.     As its name suggests, Mike Dohoney's Barrier Island Construction Specialists, Inc. ("BICS") is a construction company that Michael Dohoney owns.  From 2009 to 2011, Dohoney retained Hill to handle all of BICS's tax needs, including payroll tax accounting and reporting.

38.     When Dohoney first retained Hill in late 2009, BICS was delinquent in its filing of payroll tax returns.  Dohoney hired Hill to address the delinquency.  Hill told Dohoney that he would address that problem and also work with BICS's secretary to improve payroll tax reporting in the future.  Thereafter, Hill assured Dohoney that he was addressing those past issues and was working on new payroll tax returns as they arose.

39.     The following year, however, BICS received a number of past-due notices from the IRS and from the SCDOR.  The notices related to reporting periods for which Hill was

supposed to prepare and file returns.  Both agencies assessed interest and late penalties against BICS based on a failure to file returns.

40.     In late 2010 or early 2011, Dohoney confronted Hill, who admitted he had "dropped the ball" on BICS's payroll tax needs and had failed to file returns for the company. Hill mentioned he had been under stress from his mother's declining health.  Hill again promised to address BICS's issues.  However, he did not do so.

41.     After Dohoney continued to receive past-due and penalty notices, he spoke with Jackson sometime in the first half of 2011 about Hill's conduct.  After Dohoney suggested to Jackson that he may sue if the issues were not resolved, Jackson assigned Dohoney's file to Hicks to help with the IRS audits.

42.     With Hicks' help, Dohoney was able to mitigate some of the penalties and interest assessed due to Hill's omissions.  However, by the time this case came up for trial, Dohoney was still negotiating with the IRS on other such assessments.

**C.     AAA Fence Company of Charleston, Inc. and Gordon Ogle**

43.     AAA Fence Company of Charleston, Inc. is a fencing company that Gordon Ogle owns.  From 2009 to 2011, Hill provided accounting services to Ogle and AAA Fence including personal and corporate income tax reporting and corporate payroll tax services.

44.     After Ogle hired Hill in 2009, Ogle began receiving past-due payroll and income tax notices.  In those notices, the IRS and the SCDOR assessed interest and late penalties against AAA Fence for failing to file returns.  Ogle had hired Hill to prepare and file those returns.

45.      Ogle, like Brooks and Dohoney, discussed the notices and assessments with Hill in 2010.  Hill assured Ogle that he would take care of the late filings and the assessments. However, he did not do so.

46.     During their professional relationship, Ogle also granted Hill power of attorney to deal with the IRS on his behalf.  Thereafter, the IRS directly sent Hill more past-due notices relating to additional returns that Hill failed to file for AAA Fence.

47.     In 2011, Hicks took over Ogle's and AAA Fence's files and attempted to mitigate the IRS's and the SCDOR's assessments.  Hicks continued those efforts after he and Hammond formed their own firm.  For example, in December 2012, Hicks wrote the IRS a letter stating that AAA Fence's tax problems were caused by Hill, who "suffered from dementia" while performing work for AAA Fence.

48.     With Hicks' help, Ogle and AAA Fence resolved their issues by establishing a payment plan with the IRS.

**D.     The Clients' Lawsuits**

49.     In December 2012, Jarrod Brooks called Jackson and informed him that his father was incurring significant penalties and interest related to Hill's prior work and indicated he needed Jackson's help fixing that problem.  Jackson reported that call to CAMICO.

50.     On January 14, 2013, CAMICO received a copy of a faxed letter addressed to Jackson from an attorney representing the Clients in relation to Hill's accounting work.  The attorney stated the Clients had sustained substantial monetary losses from Hill's negligence.

51.     Upon receipt of the letter, a CAMICO representative discussed the matter with Jackson, who explained that Hill had been struggling with Parkinson's disease and that in 2010, it became evident that Hill could not keep up with his clients' work.  Jackson also stated he believed that Hill's disease caused or was related to the issues referenced in the January 14 letter.

52.    In June 2013, the Clients, the Accountants, and CAMICO entered into a tolling agreement as CAMICO investigated the Clients' claims.  CAMICO retained counsel for Hill and the firm at that time, subject to a reservation of rights.

53.    Over the course of the investigation, the Clients provided CAMICO with information regarding their claims.  Included within that information were IRS and SCDOR tax notices, several of Hill's abatement letters to the IRS, and several of his retirement letters.

54.    In May 2014, CAMICO received a letter from the Clients' attorney that was addressed to the Accountants' retained lawyer.  At one point, the Clients' attorney summarized the growing dispute between the Clients and the Accountants as follows:

> While these individuals each has his or her own specific issues, particular scope of work for which they relied on Mr. Hill, and particular damages, they all share one thing:  the story of how Mr. Hill represented to each of them that he was able to do the work they believed they hired him to do; how Mr. Hill represented to each of them that he was in fact doing the work they believed they hired him to do; how Mr. Hill advised them to rely on him and not to worry about certain deadlines because he was taking care of it; how Mr. Hill never (until very late in the game) disclosed to them his deteriorating health; and how they were all left with a substantial tax mess to clean up after he abruptly ceased his accounting work.

55.    The Clients terminated the tolling agreement early in 2015.  Thereafter, they filed three separate lawsuits[3] in South Carolina state court against Hill (individually) and Jackson and Hill, LLC.  In their lawsuits, the Clients seek damages for losses they allege Hill caused.

56.    The Clients' amended complaints are similar, in that they each allege that Hill failed to properly prepare and file tax returns for certain years due to limitations he was experiencing as a result of Parkinson's disease and that he wrongfully concealed his disease and the resulting errors he was making on the Clients' tax matters.

---

3.    Zita and the Brooks family filed the first suit, AAA Fence and Ogle filed the second, and BICS filed the third.

57. Each pleading also alleges Hill and his former firm were negligent in the following ways:

> (1) Failing to prepare and deliver tax returns on a timely basis; (2) Failing to exercise the reasonable care or competence of accountants in communicating information about available extensions, the nature and scope of penalties should the client not file or not have the funds available to pay the taxes indicated on the returns; [and] (3) Failing generally to exercise the degree and standard of care expected of certified public accountants in acknowledging and communicating honestly regarding [Hill's] personal issues, including issues relating to the care of his elderly mother and/or deteriorating mental and physical health conditions and any resulting limitations on his ability to perform professional services.

58. CAMICO has continued to provide a defense to Hill and to Jackson and Hill, LLC while reserving its right to contest the existence and amount of coverage it owes. It exercised that right by filing this declaratory judgment action.

59. The Clients' pleadings and the evidence in the record lead the Court to find that, but for the progressively debilitating effects of Hill's disease, which were exacerbated at times by the stress of caring for and losing his mother, Hill would not have mishandled RMTP's taxes or made the errors and omissions for which the Clients are now suing him.

## CONCLUSIONS OF LAW

The parties agree that South Carolina law governs their dispute. In South Carolina, insurance policies are subject to the general rules of contract construction. *Nationwide Mut. Ins. Co. v. Commercial Bank*, 479 S.E.2d 524, 526 (S.C. 1996). The insurer's duties under a policy of insurance are set forth by the terms of the policy and cannot be enlarged or curtailed by judicial construction. *Id.* Therefore, the Court must give clear policy language its plain, ordinary, and popular meaning. *See id.* However, where policy provisions may be reasonably interpreted in more than one way, the court must use the interpretation most favorable to the insured. *State Farm Fire & Cas. Co. v. Barrett*, 530 S.E.2d 132, 136 (S.C. Ct. App. 2000).

14

## I.    Declaratory Judgment Issues

The parties raise several issues over the application of the policies to the Clients' claims: (1) was the RMTP Claim subject to a reduced coverage limit? (2) do the Clients' claims and the RTMP Claim constitute a single claim? (3) assuming the Accountants did not timely report any claims, was CAMICO substantially prejudiced by the delay? and (4) does Frank Jackson have coverage as an innocent insured?  The Court answers those questions *seriatim*.

### A.    Amount of Coverage for the RMTP Claim

The Court first addresses whether the RMTP claim was subject to a reduced coverage limit.  Because Jackson reported the RMTP claim in September 2011, that claim would be covered, if at all, under the 2011–2012 policy.  Under paragraph A.4 of that policy's operative insuring agreement, if an insured became aware of a claim or potential claim in the year preceding January 28, 2011, and reports it to CAMICO during the policy period, then it will be treated as timely reported to CAMICO during the policy period.  However, there will be reduced coverage for the claim.

The analysis of the first condition—awareness of an actual or potential claim—begins with the policy's definition of "Potential Claim": "an event or circumstances that any *Insured* might reasonably expect would be the basis for a *Claim*."  The Accountants interpret that language to mean they must notify CAMICO of their errors only if they reasonably expect that a client would make a claim—that is, a demand for money or services—against them.  In their view, they did not have such an expectation until June 2011, when the IRS rejected the carryback requests for the final time.

The parties dispute whether the definition of "Potential Claim" focuses on the likelihood that a client will make a claim or, instead, on the likelihood that the event or circumstances at

issue would substantiate a claim. The Court need not resolve that dispute, for the word "might" leads to the same result under both interpretations. By the end of 2010, Hill and Jackson knew Hill had made an error that jeopardized over $20,000 in tax savings for Hill's clients and that the IRS had rejected their initial attempt to correct his error. At that point, they might reasonably have expected that Hill's error would result in RMTP demanding money or services. In other words, a claim is among the results that a reasonable person in that situation would expect. At that time, they might also have reasonably expected that Hill's oversight would give RMTP grounds to obtain money or services from them, even if the chances of RMTP actually demanding such things seemed remote. Under either view, "might" sets a low threshold that Hill and Jackson crossed no later than December 2010. Thus, because an insured was aware of the potential claim in the year preceding January 28, 2011, the first condition of paragraph A.4 is met.

The Accountants and the Clients place great weight on Hill and Jackson testifying at trial that in 2010, they in fact did not think RMTP would make a claim. Their subjective expectations at that time, however, are not dispositive. Rather, the word "reasonably" in the definition injects an objective component into the analysis—before January 28, 2011, might a reasonable person in Jackson's or Hill's shoes have thought that Hill's error and the IRS's consequent rejection of the carryback claim would lead to (or support) a claim? *See First Prof'ls Ins. Co. v. Sutton*, 607 F. App'x 276, 283 (4th Cir. 2015) (stating question of whether something constituted potential claim, which policy defined as "an incident which the Insured reasonably believes will result in a claim for damages," is "measured with respect to an objective, not subjective, standard"); *Nat'l Home Specialty Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh Pa.*, No. 6:10-cv-826-TMC, 2012 WL 1825370, at *3 (D.S.C. May 18, 2012) (applying a mixed subjective/objective test to

16

policy provision that omitted coverage for wrongful acts committed prior to the beginning of the policy's period that the insured knew or could have reasonably foreseen could lead to a claim). As the analysis above indicates, the record in this case compels the Court to answer that question in the affirmative.

As for the second condition of paragraph A.4, Jackson reported the RMTP claim during the 2011–2012 policy's operative period. Thus, the 2011–2012 policy treats the RMTP Claim as a covered, timely reported claim. However, taken in conjunction with other portions of the known-claims endorsement, paragraph A.4 provides that the $250,000 separate defense limit is not available for the RTMP claim and that total defense and indemnity coverage available for the claim is limited to the lesser of $100,000 or 25% of the per-claim limit on the declarations page (here, $1,000,000). Therefore, the 2011–2012 policy provides $100,000 in coverage for the RMTP claim. After CAMICO paid RMTP $20,600, $79,400 of that $100,000 limit remained.

### B.     Interrelatedness of the Claims

As mentioned above, "Claim" includes a demand received by an insured for money or services. That policy definition goes on to state that—

> [a] *Claim* also includes two or more *Claims* arising out of or resulting from a single act, error or omission in rendering *Professional Services*, or from *Multiple Acts, Errors or Omissions* in rendering *Professional Services*, whether such demands are made: (1) against one or more *Insureds*; (2) by one or more *Persons*, or (3) during one or more *Policy Periods*.

"Multiple Acts, Errors or Omissions" means "all acts, errors or omissions in rendering Professional Services that are logically or causally connected by any common fact(s), circumstances, situation, transaction(s), event(s), advice or decision(s)." CAMICO contends that all of the Clients' claims are logically or causally connected to one another and to the RMTP claim and thus constitute one claim under the 2011–2012 policy. The upshot of such a

conclusion would be that, as part of the RMTP Claim, the Clients' claims would all be subject to the partially exhausted $100,000 coverage limit. That would be so because the 2011–2012 policy states that a single per-claim coverage limit "applies to a *Claim* arising from *Multiple Acts, Errors or Omissions*, regardless of the number of claimants, lawsuits, or *Insureds* involved."

The Accountants and the Clients vigorously dispute CAMICO's position. They argue the Clients' claims are in no meaningful way connected to each other or to the RMTP claim.

The parties appear to agree there are no South Carolina state authorities on point, and the Court has not found any. However, three federal-court decisions help this Court predict how South Carolina would treat this policy language. First, *Bryan Brothers v. Continental Casualty Corp.* confirms that claims can be related even if they involve distinct acts, affect separate people, and occur at different times. *See* 704 F. Supp. 2d 537 (E.D. Va. 2010), *aff'd*, 660 F.3d 827 (4th Cir. 2011). *Bryan Brothers* stemmed from an insured embezzling money from her employer's clients over multiple years. *See* 704 F. Supp. 2d. at 539. In the ensuing insurance-coverage litigation, one of the questions before the district court was whether several lawsuits filed by the defrauded clients constituted "interrelated acts or omissions" under the policy and thus related back to the earliest known potential claim. *Id.* at 542–43. The policy defined that phrase as "all acts or omissions in the rendering of professional services that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." *Id.* at 543. After finding that language unambiguous, the court found that even though the claims involved different victims, they were logically connected by common facts and circumstances because they all involved the same employee, the same scheme to defraud

clients, and the same method of embezzlement. *Id.* Accordingly, the district court concluded, the claims were interrelated. *Id.*

Second, a year after *Bryan Brothers*, Judge Joseph Anderson issued an in opinion in *Continental Casualty Co. v. Jones*, No. 3:09-cv-1004-JFA, 2011 WL 3880963, at *6–7 (D.S.C. Sept. 2, 2011), *amended on other grounds on reconsideration as stated in* 2012 WL 530002 (D.S.C. Feb. 17, 2012). Like *Bryan Brothers*, *Jones* involved an insured stealing money from his clients over a period of time. *See* 2011 WL 3880963, at *1–4. Judge Anderson had to decide whether the lawsuits arising out of those claims were interrelated according to policy language identical to the provision at issue in *Bryan Brothers*. *Id.* at *6. Seeing no material distinction between *Bryan Brothers* and the case before him, Judge Anderson found the claims were interrelated "for the same reason espoused by the district court in . . . *Bryan Brothers*." *Id.*[4]

Finally, a recent Fourth Circuit opinion illustrates that multiple claims can be logically or causally connected even if they involve distinct parties and types of activities. *See W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, 814 F.3d 171 (4th Cir. 2016) ("*Miller*"). In *Miller*, the Fourth Circuit dealt with a policy that contained an "expansive" definition of "interrelated wrongful acts" that is like the language at issue here: "any wrongful acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event." *Id.* at 176. The question in *Miller* was whether two lawsuits involved interrelated acts. In the first case, a plaintiff sued for breach of contract and obtained a judgment against several defendants, including Haymount Limited Partnership. *Id.* at 174. After that, the plaintiff sued those defendants and Miller, a company related to Haymount, for allegedly engaging in fraudulent conveyances in order to make the judgment from the first case uncollectable. *Id.*

---

4.    The Court recognizes that Judge Anderson later vacated part of his opinion. *See Jones*, 2012 WL 530002, at *2. However, he did so because he decided there were genuine issues of material fact that needed to be resolved by trial. Having conducted a bench trial, the Court does not have that issue here.

Relying on the above-quoted definition, Miller's insurer treated the two lawsuits as a single claim. *Id.* at 175. Miller sued to have the lawsuits declared separate claims, but both the district court and the Fourth Circuit agreed with the insurer that the lawsuits were logically and causally connected. *Id.* at 175, 178. Although the lawsuits did not have identical sets of defendants and involved two distinct courses of conduct, the Fourth Circuit found they constituted a single claim because they shared common facts and circumstances. *Id.* at 177.

Although *Bryan Brothers* applied Virginia law and *Miller* applied Maryland law, the opinions nonetheless are instructive. In *Jones*, Judge Anderson found the Virginia law used in *Bryan Brothers* aligned with South Carolina law. *See* 2011 WL 3880963, at *6. The undersigned agrees with that assessment. Further, the principles of Maryland insurance law applied in *Miller* are cornerstones of South Carolina insurance law. *Compare Miller*, 814 F.3d at 176 (reciting rules from Maryland cases that insurance contracts are interpreted just like other contracts; that undefined terms in policies are generally construed according to their ordinary meaning; that unambiguous language is enforced as written; and that ambiguous language is construed against the insurer), *with, e.g.*, *Auto-Owners Ins. Co. v. Benjamin*, 781 S.E.2d 137, 141 (S.C. 2015) (reciting same rules from South Carolina cases). Finally, the multiple-acts definition here bears a strong resemblance to the "interrelated acts or omissions" definitions in *Bryan Brothers*, *Miller*, and *Jones*. For those reasons, this Court concludes South Carolina state courts would find the definition here unambiguous and expansive. *See Episcopal Church in S.C. v. Church Ins. Co. of Vt.*, 53 F. Supp. 3d 816, 821 (D.S.C. 2014) ("If the South Carolina Supreme Court has not addressed a particular legal issue raised in this case, this Court must predict how that court would rule if presented with the issue." (citing *Twin City Fire Ins. Co. v. Ben Arnold–Sunbelt Beverage Co. of S.C.*, 433 F.3d 365, 369 (4th Cir. 2005))).

Under that construction of the multiple-acts definition, all of the Clients' claims are logically connected to one another and to the RMTP claim. They are all based on the acts and omissions of the same person, whose tragic disease caused those acts and omissions, either in whole or in part. To be sure, those connections do not share the obviousness of the steal-conceal-repeat schemes in *Bryan Brothers* and *Jones*, nor do they form a factual web as strong as the one in *Miller*. That does not mean, however, that nothing connects the claims. Rather, CAMICO's comprehensive policy language links claims that share even a single logically connective fact, circumstance, or situation. Hill's disease-induced impairment satisfies that low threshold because, in this Court's view of the facts, it played a causal role in the Client's claims and the RMTP claim. Just as the breakdowns of integrity in *Bryan Brothers*, *Jones*, and *Miller* united all the claims in those cases, Hill's breakdown of faculty unites all the claims here.[5] Thus, they constitute a single claim.

The 2011–2012 policy states that a single limit applies for each claim, regardless of the number of errors and parties involved. Thus, the policy provides a total of $100,000 of coverage for the Clients' claims, less the $20,600 already paid on the RMTP claim and less claim expenses incurred to defend the Accountants in state court.

## C.    Substantial Prejudice to CAMICO

The Accountants and the Clients contend that even if the Accountants were late in reporting potential claims to CAMICO, the company cannot withhold coverage because the late reporting did not substantially prejudice its rights under the policies. Insurance policies frequently require insureds to provide the insurer timely notice that a lawsuit or other type of claim has been made. The purpose of such requirements "is to allow for investigation of the

---

5.    The Court, of course, does not mean to suggest Hill is to blame for the tragic circumstance of having Parkinson's disease.

facts and to assist the insurer in preparing a defense." *Vt. Mut. Ins. Co. v. Singleton ex rel. Singleton*, 446 S.E.2d 417, 421 (S.C. 1994) (citation omitted). Generally, the insured's failure to comply with a notice clause "automatically relieves the insurer of its obligations under the contract, including the payment of proceeds due, and the duty to defend and to indemnify the insured." *Wright v. UNUM Life Ins. Co.*, No. 2:99-cv-2394-23, 2001 WL 34907077, at *2 (D.S.C. Aug. 31, 2001). However, when "the rights of innocent parties are jeopardized" by that failure to comply, the insurer cannot deny coverage based on that failure unless it proves the failure substantially prejudiced its rights under the policy. *Vt. Mut. Ins. Co.*, 446 S.E.2d at 421 (citation omitted).

CAMICO's policies do contain provisions that required the Accountants to report claims and potential claims in a timely manner. For example, the policies obligated the Accountants to "[p]romptly notify [CAMICO] or its authorized representative of any *Claim* or *Potential Claim*." Similar timely-notice provisions in insurance policies have generated substantial-prejudice litigation in this Court in recent years. *See, e.g.*, *Episcopal Church in S.C.*, 53 F. Supp. 3d at 827–30; *Berenyi, Inc. v. Landmark Am. Ins. Co.*, No. 2:09-cv-1556-PMD, 2010 WL 233861, at *6–7 (D.S.C. Jan. 14, 2010). Importantly, however, the timely notice clause in CAMICO's policy is not the provision that has caused only a reduced amount of coverage to be available. Rather, as discussed in section I.A of this Order, that result flows primarily from the combined effect of the insuring agreement's paragraph A.4 and the potential-claim definition. The language of those provisions differs greatly from the timely-notice clauses that have been subjected to substantial-prejudice analysis. The Court questions whether South Carolina law would apply the substantial-prejudice requirement to those provisions, and it has not found a clear answer.

Ultimately, the Court need not answer that question in this case. Even assuming the requirement applies, CAMICO has satisfied it here. CAMICO representative Mark Aubrey testified at trial that CAMICO engages in mitigation efforts to prevent potential claims from becoming actual claim or, failing that, to at least mitigate losses. Because CAMICO insures accountants, those efforts include negotiating with federal and state tax agencies and appealing their decisions. CAMICO guarantees policyholders unlimited use of those services. With respect to the RMTP claim—the claim that triggered the reduced coverage limit—the Accountants did not notify CAMICO of the problem until after the IRS had rejected the claim three times. According to Aubrey, by the time CAMICO learned of the matter, the Accountants had already unsuccessfully exhausted the available abatement avenues; all CAMICO could do was negotiate a settlement payment with RMTP. That loss of opportunity to investigate Hill's error and to engage the IRS substantially prejudiced CAMICO. *Cf. Founders Ins. Co. v. Richard Ruth's Bar & Grill LLC*, No. 2:13-cv-3035-DCN, 2016 WL 3189213, at *13 (D.S.C. June 8, 2016) (finding insurer was substantially prejudiced by not receiving notice of lawsuit against insured until after default had been entered, as the insurer had lost the opportunity to investigate the claim, assert defenses, or negotiate unhandicapped); *see also id.* at *12 (discussing South Carolina cases that illustrate substantial prejudice).

The Accountants and the Clients argue CAMICO was not prejudiced because it learned of the Clients' claims well before the Clients filed their lawsuits, and it even participated in pre-suit investigations of those claims. Their argument stems from the statement in *Vermont Mutual Insurance Co.* that the purpose of timely notice clauses is to enable insurance companies to conduct meaningful investigations of the facts and to prepare defenses for insureds in a timely manner. *See Vt. Mut. Ins. Co.*, 446 S.E.2d at 421. That statement, however, contemplates the

familiar scenario in which an injured party has formally made a claim—typically by filing a lawsuit—against the insured. The policy provisions at issue here contemplate a different scenario: an insured's error may impact a client's liability to a tax authority but there may yet be opportunities to change the authority's decision before the client is harmed or asserts a claim. Consequently, and as the record indicates, the purpose of those provisions is to afford CAMICO a meaningful chance to participate in those pre-claim opportunities before it faces financial exposure for the error. Although that purpose is similar in spirit to the one mentioned in *Vermont Mutual Insurance Co.*, it is distinct in its focus. Thus, the fact that CAMICO had timely notice of the Clients' claims is irrelevant to the question of whether CAMICO's pre-claim opportunities to engage with the IRS were substantially prejudiced.[6]

### D.     The Innocent-Insured Provision

As mentioned above, each of the policies at issue contains a provision that can provide innocent insureds coverage "[i]f any coverage for a *Claim* would be void, excluded, suspended or lost as a result of any *Insured's* failure to comply with" the policy's claim reporting requirements. Jackson argues that even if Hill and the accounting firm are subject to the known-claims endorsement's reduced coverage, he is entitled to full coverage under that provision as an innocent insured. CAMICO responds that the innocent-insured provision does not apply because Jackson faces no potential personal liability in the Clients' cases and in any event, he failed to comply with the provision's conditions.

---

6.     The Court has also considered whether CAMICO was substantially prejudiced in its opportunities to intervene before the Clients' issues became claims. Although CAMICO did present evidence of such prejudice, that question is not relevant. The Clients' claims are subject to a single reduced coverage limit because they constitute a part of the RMTP Claim under the policy's expansive multiple-acts definition. Whether or not they were timely reported to CAMICO plays no role in that analysis, and the policy's multiple-acts definition could not reasonably be construed as a timely notice provision that would trigger substantial-prejudice analysis.

The Court agrees that the provision does not apply, but its analysis differs somewhat from that offered by CAMICO.  One of the insuring agreement's conditions precedent is that "the *Claim* was . . . made against the *Insured*."  Here, neither RMTP nor any of the Clients made a claim, as the policies define that term, against Jackson as an individual.  The claims—demands for services and money, lawsuits, and tolling-agreement demands—have been made only against the firm and against Hill individually.  Consequently, even though Jackson is an insured under the policies, he has no coverage for any of the claims at issue because they were not made against him.

Moreover, the innocent-insured provision takes effect only if an insured loses coverage *because* of a failure to follow certain claim reporting requirements.  As just explained, that is not the reason that Jackson lacks coverage.  Consequently, even assuming *arguendo* that Jackson complied with the innocent-insured provision's coverage conditions, the provision is inapplicable because the scenario triggering its applicability did not happen to him.  *Cf. Bryan Bros.*, 704 F. Supp. 2d at 542 (finding innocent-insured provision inapplicable because insurer denied coverage on ground unrelated to the circumstances that triggered provision).

### E.     Conclusion as to Declaratory Judgment Issues

For the foregoing reasons, the Court declares that (1) the Clients' claims and the RMTP claim constitute a single claim under the 2011–2012 policy; (2) the 2011–2012 policy provides $100,000 of coverage for indemnity and defense costs for that combined claim, less the $20,600 settlement and defense costs in the Clients' lawsuits; (3) assuming South Carolina's substantial-prejudice doctrine applies here, CAMICO has proven such prejudice; and (4) Jackson does not have coverage as an innocent insured.

## II.    The Accountants' Counterclaims

As mentioned above, the Accountants have alleged counterclaims against CAMICO for breach of contract and insurance bad faith.  The factual theory of liability they allege for both claims is the same: by contending the Clients' claims are related to the RMTP Claim and its reduced coverage limit, CAMICO is breaching the terms of one or more of the policies[7] and violating the implied covenant of good faith and fair dealing.[8]

The Accountants' breach of contract claim fails.  As explained above in Part I of this order, CAMICO's position is consistent with the terms of the 2011–2012 policy.  Because the Accountants cannot establish the essential element of breach, the claim fails.  *See S. Glass & Plastics Co. v. Kemper*, 732 S.E.2d 205, 209 (S.C. Ct. App. 2012) ("The elements for a breach of contract are the existence of the contract, its breach, and the damages caused by such breach." (citing *Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (S.C. 1962))).

As for insurance bad faith, the Accountants frame their claim under the elements for recovery set forth in *Bartlett v. Nationwide Mutual Fire Insurance Co.*:

> (1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) a refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured.

348 S.E.2d 530, 532 (S.C. Ct. App. 1986), *overruled on other grounds by Charleston Cty. Sch. Dist. v. State Budget & Control Bd.*, 437 S.E.2d 6 (S.C. 1993).  Under that rubric, the Accountants' claim fails at the second element.  Although CAMICO is not providing all the

---

7.    The Accountants have not specified which insurance policy or policies they believe CAMICO breached.

8.    At trial, the Accountants also asserted, as theories of bad faith, that CAMICO improperly assigned a single employee to handle defense and coverage issues and that it has unduly restricted the activities of the defense attorney it retained for them.  Although the Accountants did not include these theories in any pleading, the parties tried them by implied consent.  *See* Fed. R. Civ. P. 15(b)(2).

indemnity and defense coverage that the Accountants seek, it has not refused to pay any benefits actually due.

The Court will enter judgment for CAMICO on the Accountants' counterclaims.

## CONCLUSION

In sum, based on the foregoing, CAMICO is entitled to the judicial declaration provided in Section I.E of this Order.  Additionally, CAMICO is entitled to judgment in its favor on the Accountants' counterclaims. Each party shall bear its own costs and fees.

Accordingly, it is **ORDERED** that judgment be entered in favor of CAMICO Mutual Insurance Company.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**December 22, 2016**
**Charleston, South Carolina**